**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**COVINGTON**

**CRIMINAL CASE NO. 25-mj-2602-CJS**

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**MEMORANDUM OPINION & ORDER**

**JADA REYNOLDS**                                                    **DEFENDANT**

\*\*\*  \*\*\*  \*\*\*  \*\*\*

A bench trial in this petty offense matter was held on April 23, 2026.  (R. 7).  At that time, the Court heard evidence and took the matter under advisement pending its ruling or verdict.  (*Id.*).  Upon full consideration of the record, the Court hereby finds Defendant Jada Reynolds **not guilty** of the charged offense of disorderly conduct.

I.      **BACKGROUND**[1]

Reynolds worked for the Internal Revenue Service ("IRS") in its Covington, Kentucky office for several years.  The primary purpose of that IRS location is to act as a call center.  In May 2025, Reynolds was employed by the IRS as a Contact Representative.  Reynolds's primary responsibilities in her position as a Contact Representative were to answer calls on the toll-free line from taxpayers, perform account adjustments, and perform penalty adjustments.  At that time, her first-level supervisor was Kimheath Moeung, and her second-level manager was Tanesha McCants Smith.  Smith has worked for the IRS for 12 years, and she is currently a Program Manager.  In May 2025, Smith was a Department Manager, who oversaw seven Contact

---

[1] Much of the factual background discussed here is drawn from the testimony of the witnesses offered during the bench trial.  (*See* R. 7).  The audio files of the trial are available through the Clerk of Court's Office and can be found at KYED-COV__25-2602-PETTY-OFFENSE_20260423_141124 and KYED-COV__25-2602-PETTY-OFFENSE_20260423_161531.

Representative teams, which comprised about 100 people.  According to Smith, there had been issues with Reynolds's work performance.

Separately relevant to the timeline is that, in February 2024, Reynolds filed an Equal Employment Opportunity ("EEO") complaint, alleging harassment by certain managers, including Smith.  Reynolds testified that she had even obtained an emergency placement based on some of the harassment she had reported.  Reynolds was permitted to work on her EEO proceedings during work hours, but she needed to let management know when she would be working on such matters so the team could cover her duties.  Smith testified that, on May 20, 2025, she was unaware of the status of Reynolds's EEO case.

The events underlying Reynolds's present charge of disorderly conduct primarily occurred over three days in May 2025.[2]  Smith testified that on May 19, 2025, she and Moeung tried to arrange a meeting to address certain issues with Reynolds, including concerns that she had not logged in to the IRS phone system and that she was on a different floor and in a different work area.[3]  That afternoon, after Reynolds returned to her work area, Moeung asked her to come to Smith's office so her managers could discuss with her their concerns.  At that time, Reynolds informed the managers that any communications with her needed to be in writing; she also requested to have a union representative present at any meeting.  Reynolds testified that she had requested communications with management to be in writing based on several years of perceived harassment while working at the IRS.  Smith informed Reynolds that she would have to meet with

_____

[2] The written record, Smith's testimony, and Reynolds's testimony are inconsistent to a certain extent on the timing of the events in question.  The Court largely follows the testimony of Smith in determining the sequence of events.

[3] Reynolds testified that she would set up meetings with EEO specialists and that she would communicate such meetings to Moeung, including on May 19, 2025.  She also testified she was working on matters related to her EEO case on May 19 and 20.

management when it was required, and communications from management would not be limited to writing.

Reynolds refused to meet with management and stated she wanted a union representative. Smith informed her that she had a union representative ready for the meeting; Smith also asked the union representative to step onto the floor to see if the representative could assist in calming Reynolds down because her voice was elevated (because they work in a call center and other representatives were on calls with taxpayers). Reynolds still refused to meet with management, but she did meet with the union steward. Smith understood that Reynolds, the union steward, and Reynolds's manager were supposed to meet later in the day, but they never did. Thus, meetings with Reynolds and management did not occur that day.

The next day, May 20, 2025, Moeung informed Smith that he had received an email from Reynolds that she would be late and would be working on "internal business matters" and that she would not be logged in to the phone system. Smith told Moeung to request a meeting with Reynolds and to put it on the calendar for mid-morning (around 10:30-10:45), so Smith could discuss with Reynolds the proper procedures to request leave and to figure out what internal business matters Reynolds was handling so Smith could account for Reynolds's time. Smith had a union steward ready for the meeting, but Reynolds did not show up to the meeting as scheduled.

Smith saw that Reynolds was available on Microsoft Teams, so Smith went over to ask her to come to the scheduled meeting. Smith testified that, at that time, Reynolds started screaming very loudly—specifically yelling for "Holly," another contact representative who worked in the area, saying she was being harassed again. Smith asked Reynolds to lower her voice and asked if they could meet in Smith's office to avoid being disruptive. Reynolds then reached around Smith to knock on the door of a manager whose office was in front of her pod, yelling the manager's

3

name (Jerry) and saying that she did not feel safe.  Jerry opened his door to see what was going on.

Smith told Reynolds she had a union representative in the office; Reynolds asked for a union representative again, and Smith let Reynolds know that she had a union representative in her office and that she just needed Reynolds to come off of the floor.  Smith asked Reynolds to remove her badge from her laptop and to come off of the floor.  At that time, Reynolds pulled out her cellphone to start recording Smith.  Smith informed Reynolds that recording on federal property is prohibited.[4]  Reynolds then turned around and recorded her computer and her work space.

Smith asked Jerry to go ask the union representative, Jacob, to come out of her office. Jacob advised Reynolds to pull her card and come off the floor.  Smith testified that Reynolds continued to refuse stepping off the floor and continued to be very loud.  Because management was unable to deescalate the situation, Smith asked her management assistant to contact security guards to come up to the floor.  The guards arrived, but did not intervene to get Reynolds off the work area.  Instead, Reynolds left and went downstairs to the union office.

Still, the guards did advise Smith to file a SAM-C (security) report, and the guards decided to contact the Federal Protective Service ("FPS"), or federal police, because Reynolds's actions were a loud disruption on the floor and because Reynolds was recording on the floor.  FPS Officer David Reid responded that day; he asked Smith what had happened and she gave him a statement. Officer Reid thought Reynolds's actions constituted disorderly conduct, rising to the level of a criminal offense.  Officer Reid told Smith he would come back the following day to give Reynolds a citation.

---

[4] Counsel for the Government asked Smith whether such recording was prohibited by IRS regulations, and Smith answered in the affirmative, saying "it's a disclosure issue."

On May 21, 2025, Officer Reid came to Smith's office and met with her and Moeung. The two managers gave Reid statements and let him know what had happened the prior two days. Officer Reid said he would prefer Smith to go get Reynolds off the work area; Smith did not feel comfortable going without a witness, so Reid stood at Smith's door to watch. Smith walked to Reynolds's area and let her know that they had a meeting (which Reynolds had been invited to via Outlook). When Smith arrived at Reynolds's work area, Reynolds requested a union representative and was loud enough that Officer Reid could hear her. Officer Reid came over and reiterated to Reynolds that a union steward was not needed because it was a criminal matter. Reynolds refused to come off the floor and to follow the directions of the officer.

Smith testified that Reynolds was so loud that she and Officer Reid walked away from her. A union steward was requested to come to the floor, but by the time the steward arrived, Reynolds was gone. Eventually, Reynolds was located, and she returned to the floor with another union representative. Reynolds had some bags in her hands that she had not left with, and Officer Reid told her to place them down. When she refused to do so, Officer Reid physically detained her by grabbing her wrist and removing her from the work area.

After these events, Reynolds was placed on administrative leave pending investigation. Although she did eventually return to work, she ultimately resigned from the IRS in November 2025. She testified during trial that she never yelled or raised her voice, used her phone to record, or banged on Jerry's door during the events in May 2025; she further submitted that the only time she said anything was when Officer Reid grabbed her arm and she was scared so she said, "Help."

Procedurally, Reynolds was issued a citation by Officer Reid. (R. 1). The Violation Notice (numbered Violation 9356093) cites Reynolds for "Disturbances – Disorderly Conduct" under 41 C.F.R. § 102-74.390(a). (*Id.*). Reynolds refused to sign the Violation Notice. (*Id.*). The Violation

5

Notice and the Statement of Probable Cause list May 20, 2025, as the date of the offense. (*Id.*; R. 1-1). The Statement of Probable Cause reads:

> Investigation revealed that Reynold was observed by several witnesses becoming loud and causing a disturbance within federal IRS space. When I approached her she became loud and caused a disturbance. Refusing to comply with law enforcement officers.

(R. 1-1).[5]

In November 2025, Reynolds first appeared before the Court on the charged violation during the Court's Petty Offense Docket call. (R. 5). During that proceeding, Reynolds was advised of the violation charge and the potential penalties for the charge. (*See id.*). Although Reynolds informed the Court that she wished to have counsel appointed, she was advised that she was not entitled to Court-appointed legal representation because the United States confirmed it would not seek incarceration if Reynolds were to be found guilty. (*Id.*). Reynolds entered a plea of not guilty and requested trial be set in this matter; she was released pending trial. (*Id.*).

On April 23, 2026, the parties appeared before the undersigned for a bench trial at the U.S. Courthouse in Covington. (R. 7). Reynolds represented herself at trial, and the United States was represented by Assistant United States Attorney Elaine Leonhard. (*Id.*). During the trial, the Government called one witness (Smith) and did not present any documentary evidence. Reynolds, having been advised of her Fifth Amendment rights, elected to testify on her own behalf. After proof from both sides concluded, the Court heard the closing arguments of the parties. At the conclusion of the trial, the Court took the case under advisement pending its ruling/verdict. (*See*

---

[5] Although the Violation Notice spells Defendant's last name as "Reynold," she has confirmed in filings of record and during Court proceedings that it is spelled "Reynolds." Additionally, although the date signed by Officer Reid on the Statement of Probable Cause is May 20, 2025, Smith testified that the notice was issued to Reynolds on May 21, 2025.

*id.*).  The Court now issues its ruling and, for the reasons discussed below, finds Reynolds not guilty of the charged offense of disorderly conduct.

## II.    ANALYSIS

Reynolds was cited under 41 C.F.R. § 102.74–930(a).  At the time when Reynolds's citation was issued, the regulation was titled "What is the policy concerning disturbances?" and provided:

> All persons entering in or on Federal property are prohibited from loitering, exhibiting disorderly conduct or exhibiting other conduct on property that—
>
> (a) Creates loud or unusual noise or a nuisance;
>
> (b) Unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots;
>
> (c) Otherwise impedes or disrupts the performance of official duties by Government employees; or
>
> (d) Prevents the general public from obtaining the administrative services provided on the property in a timely manner.

41 C.F.R. § 102.73-930.[6]

In order for Reynolds to be found guilty of this offense, the Court must be convinced beyond a reasonable doubt that Reynolds knowingly exhibited disorderly or other conduct that created a loud or unusual noise or nuisance on federal property.  *See United States v. Shabazz*, No. 15-51502, 2016 WL 6122712, at *4 (E.D. Mich. Oct. 20, 2016), *aff'd*, No. 16-2486, 2017 WL 4956921 (6th Cir. Aug. 21, 2017); *United States v. Zagorovskaya*, No. CR 13-583 PA, 2014 WL 12665158, at *3 (C.D. Cal. Oct. 8, 2014), *aff'd*, 628 F. App'x 503 (9th Cir. 2015) (memorandum) ("To establish a violation of 41 C.F.R. § 102–74.390(a), the Government must prove beyond a

---

[6] Due to a reorganization of certain federal regulations, 41 C.F.R. § 102.73-930 has been removed and reserved, and a regulation covering similar conduct now appears at 6 C.F.R § 139.35.  *See* Federal Management Regulation; Conduct on Federal Property, 91 FR 2316-01.  No parties have argued that the change to the regulation under which Reynolds was cited affects these proceedings in any way.

7

reasonable doubt that the defendant, while (1) entering in or on property under the authority of the GSA, (2) knowingly (3) created a nuisance."); *see also United States v. Kertesz*, 835 F.2d 880, at *2 (6th Cir. 1987) (per curiam) (table) (addressing an older, similar regulation: "Since the regulation is written in the disjunctive, the government need only prove that conduct fits one of its categories.").[7] Further:

> because federal agencies are charged with observance of the GSA Conduct Rules, 41 C.F.R. § 102-74.365, and because those rules "shall be posted and remain posted in a conspicuous place on the property," 40 U.S.C. § 1315(c), the Government must also establish that the defendant was on notice that [her] conduct was prohibited, either because the GSA Conduct Rules were posted in a place 'reasonably calculated to impart' their prohibitions, or because defendant had actual knowledge of the prohibition by verbal warning or the like.[8]

*United States v. Reardon*, No. 6:25-cr-227-01, 2026 WL 123302, at *5 (W.D. La. Jan. 16, 2026) (addressing charge under subsection (b) of the regulation)).

As a preliminary matter, no one disputes that Reynolds's actions occurred on federal property. Concerning the other elements, the United States submitted during closing argument that the disorderly conduct element could be satisfied by the Court finding Reynolds had either caused a loud noise or a nuisance. Here, the Government pointed to Smith's testimony that, on May 20, 2025, Reynolds began yelling other individuals' names and began recording with her phone, which is prohibited on IRS property. For her part, although Reynolds's testimony was

---

[7] Some case law suggests another element requiring the individual to have impeded or disrupted the performance of official duties by a government employee or disturbed the use for which the federal property was intended. *See United States v. Komatsu*, No. 18-CR-651 (ST), 2019 WL 2358020, at *4 (E.D.N.Y. June 4, 2019) ("As such, the authorizing statute and the other regulations in § 102-74 further support the application of a limiting construction requiring the conduct proscribed under the challenged regulation to be that which impedes or disrupts the performance of official duties by government employees."); *Kertesz*, 835 F.2d 880, at *3 ("The fact that this regulation, entitled disturbances, applies only on government property gives rise to the natural construction of the term nuisance as prohibiting conduct on federal property which disturbs the use for which the property was intended.").

[8] The regulation at issue in *Reardon* is the same that Reynolds was cited under. The Court thus follows its reasoning, but recognizes that 41 C.F.R. § 102-74.365 has also since been removed and reserved.

8

difficult to follow, and at times unfocused, she still maintained at trial that she never yelled or raised her voice, used her phone to record, or banged on Jerry's door during the events in May 2025. She further testified that the only time she said anything was when Officer Reid grabbed her arm and she was scared so she said, "Help." Given these competing version of events by the only two witnesses at trial, the Court struggles to make a finding whether the Government has satisfied its burden with regard to these elements. But even if the Court were to find them satisfied, the prosecution of Reynolds suffers from fatal deficiencies regarding the *mens rea* and notice elements.

Relevant here, the regulation under which Reynolds was cited does not explicitly contain a *mens rea* requirement, leading courts to conclude that it requires a defendant to have acted knowingly. *See, e.g.*, *Zagorovskaya*, 2014 WL 12665158, at *5 (citing *Staples v. United States*, 511 U.S. 600, 605-06 (1994)) ("To the extent that Defendant is arguing that 41 C.F.R. § 102–74.390(a) includes a 'knowingly' mens rea element, this Court agrees."); *Reardon*, 2026 WL 123302, at *7 ("Courts considering actions prohibited by the GSA Conduct Rules have concluded that, to have the requisite *mens rea*, a defendant must generally know the facts that make his conduct fit the definition of the offense, even if he does not know that the facts constitute a crime."). Additionally, the case law requires Reynolds to have been on notice that her actions were illegal. *See Reardon*, 2026 WL 123302, *8 ("Courts applying the Disturbance Provision at 41 C.F.R. § 102-74.390 have interpreted it to require that a defendant be placed on notice that his conduct is illegal before being arrested."); *see also United States v. Marotz*, 75 F. Supp. 3d 1167, 1172 (N.D. Cal. 2014).

During the bench trial, the Government offered no evidence regarding any signs posted in the IRS building that would have put Reynolds on notice that causing a loud noise or nuisance

would subject her to criminal liability.  *See Reardon*, 2026 WL 123302, \*8; *see also generally United States v. Cassiagnol*, 420 F.2d 868, 873 (4th Cir. 1970) (addressing challenge to another GSA regulation regarding "nuisances") ("These rules and regulations, all of which were prominently posted in the area in which the demonstration took place, gave clear notice that certain conduct on government property was prohibited.").  And although there was evidence that Smith informed Reynolds that she was prohibited from videoing her workplace, Smith testified such actions were prohibited by IRS regulations because it was "a disclosure issue."  Moreover, there was no specific evidence regarding what IRS regulations these were.  *See Reardon*, 2026 WL 123302, at \*8 (collecting cases).[9]  It is also worth noting that the probable cause statement discusses Reynolds "becoming loud and causing a disturbance" and "[r]efusing to comply with law enforcement officers," but the statement does not address either her state of mind or any notice she would have had that her actions were prohibited.  (*See* R. 1-1 at Page ID 2).

Because there is no evidence showing—beyond a reasonable doubt—that Reynolds's actions were knowing and that she had notice her conduct was illegal, Reynolds must be found not guilty in this matter.  *See Marotz*, 75 F. Supp. 3d at 1172-73 ("If the Government had publicly posted a copy of 41 C.F.R. § 102–74.390 as required by regulation, [law enforcement] would have

---

[9] Nor is this case like those in which courts have found a defendant to have acted knowingly by throwing items at or threatening to kill a federal worker or by other obvious actions.  *See Zagorovskaya*, 628 F. App'x at 504 ("To the extent Zagorovskaya argues that she cannot be convicted because she did not know that throwing her hair clip or threatening to kill a security officer actually constituted a 'nuisance' prohibited by regulation, she is wrong."); *cf. Cassiagnol*, 420 F.2d at 873-74 ("It would not require a high degree of intelligence or understanding for one to reasonably conclude that breaking through a line of United States marshals who were lined up between the demonstrators and the Pentagon, a government building of highly strategic importance to the defense of the United States, could subject him to charges for disorderly conduct or that remaining on government property which was closed to the public during nonbusiness hours (according to the rules and regulations of GSA posted in the demonstration area) beyond the expiration of the demonstration permit could subject him to charges for disorderly conduct or unwarranted loitering and assembly.").  That Reynolds is accused of becoming loud and disruptive through interactions with management in her *workplace* (including management whom she had reported harassment by) is relevant to the inquiry of whether she had notice that her actions would subject her to criminal liability.

had the authority to arrest Appellant.  Similarly, had Appellant continued his conduct after being told that it would lead to his arrest, that too would have given [law enforcement] the authority to arrest him.  But in the absence of evidence that the Government complied with its notice obligations, Appellant's conviction must be reversed").

## III.    CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that Reynolds is hereby **found NOT GUILTY** of the offense of disorderly conduct.  A separate Judgment shall issue.

**IT IS FURTHER ORDERED** that the further proceedings scheduled in this matter for **Thursday, July 16, 2026, at 1:30 p.m. EDT** are hereby **canceled.**

For any right of appeal, the parties are directed to Federal Rule of Criminal Procedure 58.

Signed this 13th day of July, 2026.



Signed By:

_Candace J. Smith_

United States Magistrate Judge

G:\Judge-CJS\DATA\Orders\crim cov\2025\25-2602 Reynolds MOO ng.docx

11